Filed 11/6/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B270574 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA109983) |
| v. | |
| DANNY MICHAEL GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge. Affirmed.

Emily Lowther Brough, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Tannaz Kouhpainezhad, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

*People v. Cruz* (2016) 2 Cal.App.5th 1178 (*Cruz*) held that former CALJIC No. 2.50.01—which permits a juror to draw an inference of a defendant's disposition to commit a sex offense based on proof of a *charged crime* by a preponderance of the evidence—unconstitutionally lowers the prosecution's burden of proof and results in structural error requiring reversal.  We disagree with the reasoning in *Cruz*.  We hold that the former CALJIC No. 2.50.02, a similarly worded pattern instruction on the use of charged acts of domestic violence to prove a disposition to commit domestic violence, does not lower the prosecution's burden of proof.  Moreover, in this case the jurors were told seven times that the burden of proof was on the prosecution to prove guilt beyond a reasonable doubt, and no reasonable juror would have concluded that a conviction could be based on a preponderance of the evidence.

## PROCEDURAL HISTORY AND DEFENDANT'S CONTENTIONS

Defendant and appellant Danny Michael Garcia was charged with committing eight offenses against Amanda P., his girlfriend and the mother of his child.  The jury found defendant guilty of four of the eight charges:  count 2—first degree burglary with another person present (Pen. Code, § 459)[1]; count 3—infliction of injury on a spouse, cohabitant,

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

girlfriend, or child's parent after a prior conviction (§ 273.5, subd. (f)(1)); count 4—dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)); and count 7—misdemeanor violation of a domestic violence restraining order (§ 273.6, subd. (a)). Defendant was found not guilty in count 8 of robbery (§ 211), and the jury was unable to reach a verdict in count 1, charging kidnapping (§ 207, subd. (a)), in count 5, charging making a criminal threat (§ 422, subd. (a)), and in count 6, charging false imprisonment (§ 236).[2] The trial court sentenced defendant to nine years four months in state prison.

Over defendant's objection, the prosecution introduced evidence of his prior uncharged acts of domestic violence against Amanda. The trial court instructed the jury under former CALJIC No. 2.50.02 that it was permitted to draw a discretionary inference *as to all counts* that defendant had a disposition to commit domestic violence if the jury first found defendant had committed a charged or uncharged offense involving domestic violence by a preponderance of the evidence.

Defendant's appeal primarily challenges the constitutionality and correctness of instructing that *charged offenses* may be considered as evidence of propensity under former CALJIC No. 2.50.02, and the propriety of admitting the *uncharged offenses*. He contends: (1) the court

---

[2] The jury was divided 11-1 favoring not guilty in count 1. It was divided 9-3 favoring a guilty verdict in counts 5 and 6.

committed prejudicial error by instructing the jury to consider charges that are not crimes of domestic violence in determining whether defendant should be convicted of cohabitant injury; (2) the court lowered the prosecution's burden of proof by incorrectly instructing that propensity evidence of current domestic violence charges may be used if the charges are found true by a preponderance of the evidence; (3) the court abused its discretion by admitting evidence of past domestic violence incidents and phone sex recordings; and (4) the cumulative effect of these errors requires reversal of all convictions. In a separate argument, defendant contends the court's failure to properly instruct the jury on witness intimidation was prejudicial error.

We hold that the jury was properly permitted to consider the charges of burglary and dissuading a witness when deciding whether to draw a discretionary inference that he had a disposition to commit domestic violence, because both of the charges qualify as domestic violence offenses as defined under Evidence Code section 1109. Former CALJIC No. 2.50.02 correctly stated the applicable standard for a juror's consideration of charged offenses for this purpose as a preponderance of the evidence. The instruction also clearly differentiated between the preponderance of the evidence standard of proof for drawing a discretionary inference of propensity and the beyond a reasonable doubt standard that must be met before a defendant may be convicted. The trial court did not err in admitting evidence of past domestic violence incidents and

4

phone sex recordings. Having found no merit to these contentions, we necessarily conclude that defendant was not prejudiced by the cumulative effect of the alleged errors. Finally, the trial court did not err in instructing the jury that it must unanimously agree on the events that formed the basis of the witness intimidation charge.

## FACTS

### The Relationship Between Defendant and Amanda P. and Acts Occurring Before the Charged Offenses

Amanda P. and defendant began dating in June 2012, maintaining a relationship through June 20, 2015, the date of the charged offenses. They have a son born in November 2014.

On December 27, 2013, Amanda told defendant she believed she was pregnant. Defendant denied being the father. Defendant blocked the door as Amanda tried to leave. Defendant hit Amanda in the lip, causing her to fall to the floor and briefly lose consciousness. When Amanda awoke her "lip was split in half." Amanda called her mother to pick her up. The police were called after her mother arrived.

Officer Maxwell Moya responded to the domestic violence call. He described Amanda as scared, frustrated, and having a split lip, which Amanda told the officer was caused by defendant. She explained that an argument started when she told defendant she was pregnant and

5

defendant punched her in the mouth. Defendant, who admitted being under the influence of methamphetamine, told Officer Moya that Amanda showed up with a split lip and she attacked him by hitting him multiple times with a closed fist and open hand. Defendant said he did not punch Amanda. Officer Moya observed no injuries to defendant.

As a result of the December 27 incident, defendant was convicted on December 31, 2013, of inflicting corporal injury in violation of section 273.5. A domestic violence restraining order—People's Exhibit No. 1—was issued on the date of conviction, prohibiting defendant from coming within 100 yards of Amanda.

Amanda was in the hospital in labor with her son on November 17, 2014. She told a nurse that defendant was the father, and provided defendant's name to her. Defendant arrived at the hospital drunk. He gave a false name, which caused security to investigate. Defendant was arrested once it was determined he was the subject of the restraining order. The Department of Children and Family Services (the Department) became involved as a result of the incident at the hospital.[3] Four days earlier, defendant hit Amanda, and a report was taken by the police. The police had responded to incidents involving Amanda and defendant more than seven times.

---

[3] The Department was also involved with Amanda's daughter as a result of a fight between Amanda and her sister. Amanda was arrested and the Department took custody of her daughter.

Despite the restraining order, Amanda and defendant remained in contact. Amanda loved defendant during this time period, but by the time of trial she felt she had to "put my foot down. My kids deserve the best and so do I."

**The Charged Offenses**

*Amanda's Testimony*

Defendant and Amanda were together at her apartment on June 19, 2015, despite the existing restraining order.[4] Defendant left sometime during the night to get drugs, returning the next morning.[5] Amanda allowed defendant into the apartment. Defendant was under the influence of drugs and looked like he had not slept. Amanda told him to go home. Defendant refused. She told defendant she would call the police if he did not leave. Defendant grabbed her phone from her hand. He hit Amanda on the right side of her jaw, knocking her to the floor. Defendant punched Amanda's face and body with closed fists as she tried to push him off. He choked her, making it difficult to

---

[4] Amanda's children were not living with her on June 20, having been taken from her custody after the incident at the hospital.

[5] Amanda, who took medicine that sometimes affected her memory, inconsistently described the order of events on the day of the charged offenses. She also attributed some lack of recollection to the beatings inflicted by defendant.

breathe. Defendant threatened to kill her. He hit her more than ten times. Amanda tried to get her phone to call the police, but defendant grabbed and threw the phone.

After this round of violence, defendant and Amanda went to a nearby swap meet. She did not want to go with defendant, but he had her phone and would not give it back. Defendant grabbed her by the arm as they were walking down the stairs before letting go as they went to his car. Amanda did not ask for help at the swap meet because she was afraid defendant would hit her again. They were at the swap meet for approximately 30 to 45 minutes.

They returned to Amanda's apartment where a second physical altercation ensued. Amanda told defendant to leave. She tried to get away, but defendant pulled her hair and threw her to the floor. He slapped and hit her more than five times. Amanda told him he had to leave or she would call the police.[6]

Defendant left the apartment, but he returned and knocked on the door. Amanda went to the window and told defendant he could not come in. Defendant said he was not going to leave. Amanda called defendant's parents, put the phone on speaker, and told them defendant had already hit her twice. His parents told defendant he had to leave and come home.

Defendant entered the apartment through the front window after tearing off the window screen. A third physical

---

[6] Amanda expressed uncertainty over whether she regained her phone once back in the apartment.

8

altercation ensued.  Once inside the apartment defendant grabbed Amanda's phone as she tried to fend him off.  He yelled and hit her more than once on the face, the last time on the chin.  Amanda told defendant it was over and he had to leave.  He refused, stating it was over when he said it was over.  Amanda walked toward the door and turned to look at defendant.  He hit her again, knocking her to the floor and causing her to see "black for a couple of seconds."  Defendant was gone when she got up.

### *The 911 Call*

Amanda's mother and father arrived at her apartment.  Amanda's mother called 911.  A recording of the 911 call was played for the jury.  Amanda took the phone from her mother shortly after the 911 call began.  While crying, Amanda told the 911 operator it was an emergency and she needed a police officer.  She identified defendant by name.  She said it was domestic violence, explaining that defendant broke her window and beat her up.  Amanda said there was supposed to be a restraining order in place, told the operator defendant's date of birth and description, and described the car he was driving.  Amanda said he "socked me in the head, I got knots all over.  I got a bloody nose, I got a busted lip."  She said she could go to the hospital on her own.  She provided her name and was told an officer was being sent.

### *The Responding Officer and Corroborating Photos*

Officer Alan Pucciarelli responded to the 911 call. He spoke with Amanda, who was crying and very distressed. Officer Pucciarelli documented Amanda's injuries with a series of photographs, which he and Amanda identified at trial. The photographs, which we have reviewed, depict numerous bright red abrasions covering the center of Amanda's forehead, nose, and left cheek. The abrasions reach into her hairline. There is a raised knot in the center of her forehead. Amanda's right ear is shown swollen and covered in red abrasions. Scratches and abrasions, inflicted when defendant choked Amanda, are clearly visible on her neck. Other photos showed large red areas on Amanda's right shoulder, back, and arm. Officer Pucciarelli and Amanda identified a photo of the damaged window screen defendant had ripped from the window frame and another of the window from which he entered. Officer Pucciarelli saw defendant after he was detained. He observed no injuries to defendant.

### *Defendant's Jail Phone Calls*

Defendant made three recorded phone calls to Amanda from jail following his arrest. He made the calls using the jail account of another inmate, rather than using his own name and account. Recordings of the calls were played for the jury.

The first recorded call was made on July 2, 2015. Defendant told Amanda he was not taking a deal. She responded that they were making her go to court. Defendant assured her that "they're just scaring you. Babe, please, babe. . . . Don't show up." Amanda explained that she had a subpoena and if she did not appear in court, she faced time and would permanently lose custody of her children. Defendant told her that the case had nothing to do with the children and they would not take them away. Defendant said, "Please babe. Don't show up babe, don't show up, please," and that "[i]t wasn't me babe. I'm sorry." Amanda and defendant each said they loved the other, but Amanda repeatedly expressed concern over losing custody of her children, and defendant repeated that they were just scaring her. Defendant told her, "I can't do all this time in here babe," "[i]t's like nothing happened if you don't show up," and "[i]t was the drugs babe." Defendant offered to marry Amanda and said they would release him if she did not show up. Defendant told her they were trying to give him eight years "[f]or some bullshit." "[I]f you[] don't show up my attorney says they will dismiss all the cases." "I wanta change babe."

The second recorded call was made on July 4, 2015. Amanda told defendant she was drunk. She said they would take away her kids if she did not come to court. Defendant assured her that they could not take the children, despite her protests that lawyers told her a warrant would be issued for her arrest if she did not show up. Defendant responded

11

that lawyers are professional liars and they were lying to her.[7]

The third call from jail was made on July 14, 2015. Amanda began by telling defendant she was drunk at home, lying in bed. He told her, "[D]on't show up babe." He said if she did not show up they would let him go home. He begged her not to come to court, promising, "I'll change for reals [*sic*] this time." Defendant asked her to ignore the subpoena, explaining, "you're my only hope. And I think you don't want to press charges, alright?" Defendant told her they are going to give him "a long time," and "I can't do this." Defendant continued, "You better not show up, if you really loved me, eh. That's what, that's how [I will] know if you really loved me or not, eh. And if not, then don't even bother writing me Amanda. Just let me go, alright?" She replied that she loved him. Defendant continued to press Amanda not to show up to court. He said he cared about the kids but needed to be out to do his classes. His attorney said they would drop the charges and then they would not do anything to her. Defendant said he was going to help her get her children back and they would have more kids. He was going to go to classes and get a job.

---

[7] Amanda explained in her testimony that her concern over losing the children was based on her experience of losing custody after the incident at the hospital during the birth of their son, when defendant came to the hospital drunk and used a false name.

Amanda admitted sending defendant love letters after his arrest and telling him in phone conversations that she loved him.  By the time of trial she changed her mind because defendant had shown no remorse or caring for her children.  "All he cared about was himself, what he was doing.  I seen him for who he is."  She began to realize defendant was not completely honest with her.  She was scared of defendant because he "would beat me like I was a guy."

# DISCUSSION

## Issues Relating to Former CALJIC No. 2.50.02[8]

---

[8] The trial court instructed the jury with the Spring 2013 revision of CALJIC No. 2.50.02. The instruction was modified in 2016 and 2017, and now separately addresses proof of charged and uncharged offenses offered to prove disposition to commit domestic violence. As to charged offenses, the modified version requires proof beyond a reasonable doubt, while the preponderance of the evidence standard is limited to uncharged offenses. The Judicial Council's Advisory Committee on Criminal Jury Instructions in 2017 adopted separate instructions for charged and uncharged offenses offered to prove disposition to commit domestic violence. (CALCRIM Nos. 852A, 852B.) CALCRIM No. 852A, applicable to uncharged offenses offered to prove a propensity to commit domestic violence, uses a preponderance of the evidence standard. CALCRIM No. 852B, applicable to charged offenses offered to prove a propensity to commit domestic violence, requires proof beyond a reasonable doubt.

We do not consider the modifications made by CALJIC and CALCRIM in response to *Cruz* as an indication the committees concluded that *Cruz* was correctly decided. Pattern jury instructions follow the law as stated in binding precedent. The modifications made reflect nothing more than the committees' decisions to provide the law as stated in *Cruz* for the guidance of trial courts because the courts are bound to follow *Cruz* in the absence of contrary authority.

The trial court instructed the jury regarding the use of evidence of charged and uncharged crimes as follows:

"In determining whether defendant has been proved guilty of [] any crime of domestic violence of which he [] is charged, you should consider all relevant evidence, including whether defendant committed any other domestic violence crimes, *whether charged or uncharged*, about which evidence has been received.  The crimes charged in Counts 1–8, may be considered by you in that regard.  [¶] . . . [¶]

"If you find by a preponderance of the evidence that the defendant committed any such offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit another other [*sic*] offenses involving domestic violence.  If you find that the defendant had this disposition, you may, but are not required to, infer that he [] was likely to commit and did commit the crime or crimes of which he [] is accused.

"However, even though you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he [] committed the offenses you are determining.  If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime that you are determining.

"Unless you are otherwise instructed, you [] must not consider this evidence for any other purpose." (Italics added.)

### *Propensity Evidence*

Evidence of a person's character or predisposition to act in a certain way is generally inadmissible to prove that the person acted in conformance with that character trait on a given occasion. (Evid. Code, § 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*).) "'Such evidence "is [deemed] objectionable, not because it has no appreciable probative value, *but because it has too much*." . . . [Citations.]' [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) Evidence Code section 1109 permits proof of a defendant's character in the form of evidence of a defendant's commission "of other domestic violence." (Evid. Code, § 1109, subd. (a)(1).) Evidence Code section 1108 has a similar provision regarding "evidence of the defendant's commission of another sexual offense or offenses." (Evid. Code, § 1108, subd. (a)(1).) "[Evidence Code] sections 1108 and 1109 can properly be read together as complementary portions of the same statutory scheme. A bill analysis prepared for those who voted to enact [Evidence Code] section 1109, states that '[t]his section is modeled on the recently enacted Evidence Code [section] 1108, which accomplishes the same for evidence of other sexual offenses, in sexual offense prosecutions.' (Assem. Com. on Public

Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, at p. 3.)" (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1333 (*Brown I*).)

"'[T]he legislative history of [Evidence Code section 1109] recognizes the special nature of domestic violence crime, as follows: "The propensity inference is particularly appropriate in the area of domestic violence *because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity.* Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, *we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.* Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all." (Assem. Com. [] on Public Safety[, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) [June 25, 1996, at] pp. 3–4.)'" (*People v. Brown* (2011) 192 Cal.App.4th at 1222, 1235–1236 (*Brown II*).) "[B]y enacting [Evidence Code] sections 1108 and 1109, the obvious intention of the Legislature was to provide a mechanism for allowing evidence of past sexual offenses or acts of domestic violence to be used by a jury to prove that

17

the defendant committed the charged offense of the same type; recidivist conduct the Legislature has determined is probative because of its repetitive nature. Furthermore, it is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited." (*Brown I*, *supra*, 77 Cal.App.4th at pp. 1333–1334, fn. omitted.)

Our courts have consistently interpreted Evidence Code sections 1108 and 1109 to allow consideration of evidence of uncharged offenses. (*Villatoro*, *supra*, 54 Cal.4th at p. 1160.) In 2012, our Supreme Court held that Evidence Code sections 1108 and 1109 permit consideration of charged offenses to prove a defendant's disposition as well. (*Id.* at pp. 1161–1167.) In the context of uncharged offenses, the jury must find that an offense was committed by a preponderance of the evidence before it may be considered for propensity. (*People v. Carpenter* (1997) 15 Cal.4th 312, 382, superseded by statute on another point as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106, which in turn was superseded by statute on another point as noted in *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1119, fn. 5.) The Supreme Court has not yet addressed the question of which standard the jury must apply before considering a charged offense as propensity evidence.

18

### *Standard of Review for Jury Instructions*

"We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)" (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378 (*Fiore*).) "'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' (*People v. Smithey* (1999) 20 Cal.4th 936, 963; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.)" (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) "In particular, "'[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)" (*Fiore, supra,* at p. 1378.)

### *Offenses Involving Domestic Violence*

The jury was instructed that former CALJIC No. 2.50.02 applied to all eight counts charged against defendant. Defendant argues that two of the charged

19

offenses—burglary and dissuading a witness—should not have been included in the instruction, because those offenses "plainly do not fall within the definition of 'domestic violence' or 'abuse' as set forth in Penal Code § 13700 and Family Code § 6211."

Evidence Code section 1109 provides, in relevant part, that "in a criminal action in which the defendant is accused of *an offense involving domestic violence*, evidence of the defendant's commission of *other domestic violence* is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  (Evid. Code, § 1109, subd. (a)(1), italics added.)

Evidence Code section 1109 further states:  "'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code.  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  (Evid. Code, § 1109, subd. (d)(3).)  Both statutes define "domestic violence" as "abuse" committed against certain classes of people, including a person with whom the suspect has cohabitated, had a child, or had a dating relationship.  (§ 13700, subd. (b); Fam. Code, § 6211, subds. (b)–(d).)

## Burglary in Count 2

Under section 13700, subdivision (a), "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." "Although the crime of burglary is not a crime of domestic violence on its face, [a] trial court [may] properly [find] that under the facts of the case, the burglary was a qualifying offense allowing the People to seek to present propensity evidence under section [Evidence Code section] 1109." (*People v. James* (2010) 191 Cal.App.4th 478, 484 (*James*) [burglary with the intent to commit domestic violence falls within the definition of domestic violence in section 13700].) Where the defendant burgles with the intent to commit domestic violence, that "intent [] makes the burglary an offense 'involving domestic violence.'" (*Ibid.*) The facts of this case indicate that defendant removed the screen from Amanda's window and entered her home with the intent to commit domestic violence against her. Defendant does not argue otherwise on appeal. The trial court did not err in instructing the jury that it was permitted to consider the burglary in count 2 as evidence of defendant's propensity to commit domestic violence under former CALJIC No. 2.50.02.

21

## Dissuading a Witness in Count 4

Under section 6211 of the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.), neither proof of physical violence nor the threat of imminent physical violence is necessary to establish abuse. (§ 6203, subd. (b); *Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 853 (*Phillips*).) To the contrary, abuse includes "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." (Fam. Code, § 6203, subd. (a)(4).) "Section 6320, subdivision (a) permits the court to enjoin a party from 'harassing . . . or disturbing the peace of the other party. . . .' [¶] "'[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party. . . . Therefore, the plain meaning of the phrase 'disturbing the peace' in section 6320 may include, as abuse within the meaning of the [Domestic Violence Prevention Act], a [defendant]'s alleged conduct in destroying the mental or emotional calm of his [former cohabitant, former girlfriend, or the mother of his child]. . . .'" [Citation.]' (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146.)" (*Phillips, supra,* at pp. 852–853.) Defendant was convicted in count 4 of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)). The recorded jail calls are replete with defendant's threatening, pleading, and cajoling statements in which he tried desperately to convince Amanda not to attend court or to testify. Amanda was

clearly distressed by defendant's attempts and torn between her instinct to comply with him, and her fear of having her children taken from her. Considering the strong evidence that defendant "destroy[ed] [Amanda's] mental or emotional calm," the trial court's instruction that the jury could consider the charge of dissuading a witness in count 4 as evidence of defendant's propensity to commit domestic violence was not error.[9]

### *Burden of Proof Arguments*

Defendant contends that the trial court committed structural error by incorrectly instructing the jury on the burden of proof required when considering whether other charged offenses may be used to draw a discretionary inference that defendant had a propensity to commit domestic violence. He asserts that the correct standard of proof is beyond a reasonable doubt—not a preponderance of the evidence as stated in former CALJIC No. 2.50.02—and that by incorrectly instructing the jury, the trial court effectively lowered the burden of proof for conviction.

---

[9] Defendant appears to challenge the inclusion of the dissuading a witness charge solely on the basis that he did not threaten violence during the jail calls to Amanda. He does not expressly contest that his actions during the attack on her were not threatening or violent, nor could he do so convincingly given the overwhelming evidence against him.

23

Defendant relies primarily on *Cruz*, *supra*, 2 Cal.App.5th 1178, to support his contention. Cruz was convicted of three counts of committing a lewd act against a child under the age of 14 (§ 288, subd. (a)), and sentenced to 105 years to life in prison. (*Cruz, supra*, at p. 1180.) The trial court instructed the jury that it could consider charged and uncharged sexual offenses to draw the discretionary inference that the defendant had a propensity to commit sexual offenses. (*Id.* at pp. 1183–1184.) It gave a version of CALJIC No. 2.50.01 that parallels the version of CALJIC No. 2.50.02 given in the present case in all pertinent respects. (*Ibid.*) The *Cruz* court held that it was error to give CALJIC No. 2.50.01 because it believed that our Supreme Court's decision in *Villatoro, supra*, 54 Cal.4th 1152, "strongly implied" the correct standard for considering other charged crimes in this context was beyond a reasonable doubt (*Cruz, supra*, at p. 1186), and because the instruction was a "hopeless muddle" (*ibid.*) that was too complex for jurors to correctly understand or apply. The *Cruz* court reasoned that the instruction "presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence." (*Id.* at p. 1187.) It concluded, "the ultimate effect is to lower the prosecution's burden of proving guilt beyond a reasonable doubt." (*Ibid.*) The *Cruz* court found the error to be structural, and reversed

the judgment.  (*Ibid*.)  We respectfully disagree with *Cruz's* reasoning and result.[10]

Echoing Justice Corrigan's dissent in *Villatoro*, our dissenting colleague essentially argues *Cruz* was correctly decided and *Villatoro* was not.  We offer a few preliminary comments in response.  First, under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, we are bound by the majority decision in *Villatoro*, not by the dissent (even if we were to agree, which we have no occasion to address).  Second, the Legislature could have amended sections 1108 and 1109 to preclude use of charged offenses to prove disposition by adopting Justice Corrigan's reasoning, but it has not done so.  Third, Justice Corrigan's (and the *Cruz* court's) concern over the risk that a jury might be confused by the difference between proof by a preponderance of the evidence to create an inference of disposition, and the requirement of proof beyond a reasonable doubt to prove a charged offense, is simply not present in this case—the jury convicted on four counts, acquitted on one count, and was unable to reach a verdict on three.  Fourth, the dissent's contention that any error was structural requiring reversal fails to mention that all seven justices in *Villatoro* agreed

---

[10] The former Attorney General did not file a petition for review in *Cruz*, nor did she request depublication of the opinion.  In briefing and at oral argument in this case, the Attorney General's position was that *Cruz* was incorrectly decided.

25

that any error was harmless under the *People v. Watson* (1956) 46 Cal.2d 818, 834 standard of review.

### Burden of Proof for Charged Crimes as Propensity Evidence

We are unpersuaded that the Supreme Court intended to imply other charged crimes evidence must be proved beyond a reasonable doubt before it may be used to infer propensity. In *Villatoro*, *supra*, 54 Cal.4th at page 1167, the trial court instructed the jury it could draw the discretionary "conclusion" that Villatoro was inclined to commit the charged sex crimes if it "decided" he had committed other charged sexual offenses.[11] The instruction specified this was only one factor to consider and was insufficient to support a guilty verdict alone. (*Ibid.*) The instruction concluded: "'The People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.'" (*Ibid.*, fn. omitted.)

---

[11] *Villatoro* involved the application of Evidence Code section 1108 to charged and uncharged sex offenses. The court referenced Evidence Code sections 1108 and 1109 in its analysis. The court made clear its analysis applied to both statutory provisions. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1162–1163, fn. 5 [expressly disapproving *People v. Quintanilla* (2005) 132 Cal.App.4th 572 (*Quintanilla*), which held that Evidence Code section 1109 does not apply to charged offenses].)

Villatoro contended that other charged offenses could not be considered as evidence of propensity to commit charged crimes under Evidence Code section 1108. He also challenged the propriety of instructing under a modified version of CALCRIM No. 1191, which "failed to designate clearly what standard of proof applied to the charged offenses before the jury could draw a propensity inference from them. [Villatoro] insist[ed] that without such guidance, a juror could have used any standard of proof, or no standard at all, to convict him based on even a minimal amount of evidence supporting another sexual offense, thus depriving him of the presumption of innocence." (*Villatoro*, *supra*, 54 Cal.4th at p. 1167.)

The Supreme Court rejected Villatoro's argument that charged offenses could not be considered to support an inference of propensity. It held that the language of Evidence Code section 1108 "does not distinguish between charged or uncharged sexual offenses." (*Villatoro*, *supra*, 54 Cal.4th at p. 1160.) The court emphasized that for purposes of Evidence Code section 1108 there were few distinctions between charged and uncharged offenses, noting that "[w]hether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence." (*Id*. at p. 1164.) The court recognized that in contrast to evidence of uncharged offenses, charged offenses may not be excludable under Evidence Code section 352. However, it concluded that the necessary constitutional safeguards remained in place because trial courts may

27

"consider[] [Evidence Code] section 352 factors when deciding whether to permit the jury to infer a defendant's propensity based on this evidence." (*Id.* at p. 1163.)

The Supreme Court likewise rejected Villatoro's argument that the failure to clearly instruct on the burden of proof applied to the charged offenses for purposes of proving propensity could lead the jury to convict him of another charge upon proof less than beyond a reasonable doubt. (*Villatoro, supra,* 54 Cal.4th at p. 1167.) Because the reasonable doubt burden of proof was the *only* burden of proof identified in the instruction—the final sentence of the instruction informed the jury that the burden of proof for *both* determinations was beyond a reasonable doubt—the Supreme Court held there was no possibility that the jury would apply a lower standard when reaching a verdict. (*Id.* at p. 1168.) The court specifically declined to express a view as to whether the instruction should be given in the future. (*Id.* at p. 1169.)

We do not interpret *Villatoro* as signaling that the correct burden of proof when considering whether charged offenses may be used to infer propensity is beyond a reasonable doubt. The question of the burden of proof applicable to charged offenses in that context was not before the court. The court addressed only whether the instruction's statement of the *burden of proof for consideration of propensity evidence* had the effect of lowering the *burden of proof for conviction*. The court logically held that because the *only* burden of proof

28

referenced in the instruction was beyond a reasonable doubt, there was "no risk" that the jury would apply some other unmentioned standard when reaching a verdict. (*Villatoro, supra*, 54 Cal.4th at p. 1168.) At the same time, the court expressly declined to approve the instruction for future use, effectively reserving the question of the burden of proof when considering charged offenses in the propensity context for another day.

We do not discern any reason why the burden of proof applied to charged offenses when used for propensity purposes should differ from that applied to uncharged offenses. As with uncharged offenses, "[i]t is not the verdict itself, but rather the jury's factual finding that defendant has committed a [charged] sex offense, that the jury relies on to draw an inference of disposition or propensity." (*Villatoro, supra*, 54 Cal.4th at p. 1165.) Arguments that advocate a higher burden of proof for charged offenses as evidence of propensity appear to be rooted in concerns regarding the "'bootstrapping of verdicts' [citation] and the possibility that the jury may 'simply conclude that because it found the defendant guilty of one count, he must be guilty of the others' [citation], . . ." (*Ibid.*) But as the *Villatoro* court stated when it held that charged offenses may be considered under Evidence Code section 1108, these arguments "merely identif[y] the general concern against allowing a jury to consider propensity evidence in a criminal case." (*Ibid.*) This general concern applies equally to charged and uncharged offenses—perhaps to an even greater extent to

29

uncharged offenses that would not otherwise be presented to the jury—and provides no logical basis for requiring different burdens of proof.

The Legislature carefully considered the question of when propensity evidence may be admitted, and determined that strong public policy considerations favored allowing such evidence in cases involving domestic violence.  Just as it did not differentiate between charged and uncharged crimes for purposes of consideration as propensity evidence, it did not differentiate between the two categories of offense with respect to the burden of proof, or, in fact, designate a burden of proof for evidence of other domestic violence offenses generally.  Where, as here, the legislature is silent, "the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.)  The Legislature's decision to apply the default standard of proof to other domestic violence offenses is consistent with the well-settled principle that "'evidentiary facts'" are governed by the preponderance standard, while the reasonable doubt standard applies to the ultimate determination of guilt.  (*People v. Medina* (1995) 11 Cal.4th 694, 763; *People v. Lisenba* (1939) 14 Cal.2d 403, 430.)  A defendant's propensity to commit a crime is such an evidentiary fact.  (*People v. Anderson* (2012) 208 Cal.App.4th 851, 896–897.)  When considered for this purpose, evidence of charged crimes is collateral to the question of the accused's guilt or innocence and does not "'bear directly on any link in the chain of proof of any element of the crime.' [Citation.]"  (*Ibid.*)  "There is [] no constitutional compulsion

that such collateral fact[s] be proved beyond a reasonable doubt, nor does the presumption of the accused's innocence aid in the resolution of such fact[s]." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 965.)

The important public policy concerns behind Evidence Code section 1109 also lead us to believe the preponderance of the evidence standard of proof for propensity evidence is appropriate for both charged and uncharged offenses. "The degree of burden of proof applied in a particular situation is an expression of the degree of confidence society wishes to require of the resolution of a question of fact. [Citation.] The burden of proof thus serves to allocate the risk of error between the parties, and varies in proportion to the gravity of the consequences of an erroneous resolution. [Citations.] Preponderance of the evidence results in the roughly equal sharing of the risk of error. [Citation.] To impose any higher burden of proof demonstrates a preference for one side's interests." (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1490.) In enacting Evidence Code section 1109, the Legislature acknowledged the seriousness of domestic violence offenses, and the difficulty of proving such crimes, which are secretive and often result in a credibility contest between perpetrator and victim. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1311.) It corrected the imbalance of power in favor of perpetrators by allowing the jury to consider highly relevant propensity evidence. (*Ibid.*) Application of the preponderance of the evidence standard is consistent with the statute's purpose.

The dissent is troubled that Amanda's testimony was the sole source of the propensity evidence, and that the crimes concerned differed in nature and occurred over the course of a few hours.  That concern is not relevant to the issues defendant raises here.  Evidence Code section 1109 does not limit propensity evidence to evidence provided by third parties.  (See *People v. Gonzales* (Oct. 24, 2017, B276101) __Cal.App.5th__ (*Gonzales*) [holding that evidence of uncharged crimes is not limited to evidence provided by third parties under section 1108].)  *Villatoro* held that the definition of another sexual offense or offenses in Evidence Code section 1108 "contains no limitation, *temporal or otherwise*, to suggest that [it] covers only offenses other than those for which defendant is currently on trial."  (*Villatoro*, *supra*, 54 Cal.4th at p. 1161, italics added.)  It follows that the parallel language in Evidence Code section 1109 also allows evidence of crimes that occurred within the same time period to be used to demonstrate propensity.  As for the disparate nature of the crimes, the legislature clearly defined evidence of another crime to encompass crimes of a dissimilar nature but involving similar intent, as courts have recognized.  (See *James*, *supra*, 191 Cal.App.4th at p. 484 [holding that where the defendant burgles with intent to commit domestic violence that "intent [] makes the burglary an offense 'involving domestic violence'" under section 1109]; *People v. Story* (2009) 45 Cal.4th 1282, 1291–1294 (*Story*) [first degree felony murder with rape and burglary based on entry with the intent to rape qualifies as a sexual offense

under section 1108]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 898–899 [assault with intent to commit rape qualifies as a sexual offense under section 1108]).

The issues raised by the dissent are not without redress. In *Villatoro*, the Supreme Court noted with approval the Court of Appeal's observation that "[although] evidence of the charged offenses may not be excludable under section 352 . . . nothing precludes a trial court from considering section 352 factors when deciding whether to permit the jury to infer a defendant's propensity based on this evidence . . . . 'Even where a defendant is charged with multiple sex offenses, they may be dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider one or more of the charged offenses as evidence that the defendant likely committed any of the other charged offenses.'" (*Villatoro*, *supra*, 54 Cal.4th at p. 1163; accord, *Story*, *supra*, 45 Cal.4th at pp. 1294–1295.) Thus, a defendant is safeguarded from the use of charged crimes that are more prejudicial than probative as propensity evidence under Evidence Code section 352. In appropriate cases, the trial court may instruct the jury that it is not to consider other charged crimes evidence for propensity purposes.

In the present case, defendant has not argued that the propensity evidence was more prejudicial than probative under Evidence Code section 352. Absent such a challenge, we will not address the issue on appeal. (See *Gonzales*,

*supra*, __Cal.App.5th__ [declining to address whether uncharged crimes evidence was properly admitted as propensity evidence where defendant instead challenged the propriety of instructing under CALCRIM No. 1191].)

### **Burden of Proof for Conviction**

We also disagree with *Cruz's* conclusion that the application of two different standards of proof within a single instruction creates confusion sufficient to lower the burden of proof for conviction. In our opinion, the reasoning of our Supreme Court in *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*), which held the 1999 revised version of CALJIC No. 2.50.01 constitutional, resolves the issue because as in *Reliford*, the instructions here clearly conveyed the proper burden of proof for conviction to the jury. Moreover, the jury's divided resolution of the eight charged offenses in this case belies the suggestion in *Cruz* that a jury would be unable to understand the way the instruction operated. (See *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 [acquittal of three charges demonstrated that jury understood the applicable burden of proof].)

In *Reliford*, the defendant challenged a modified version of the 1999 revised version of CALJIC No. 2.50.01, which instructed on prior *uncharged* sexual offenses in relevant part:

"If you find that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], you

34

may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.

"However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime. The weight and significance of the evidence, if any, are for you to decide.

"You must not consider this evidence for any other purpose."

(*Reliford*, *supra*, 29 Cal.4th at p. 1012.)

Reliford argued that the instruction was "'likely to mislead the jury concerning the supposedly limited purpose for which they may consider the prior crimes evidence,' and [] the instruction is 'likely to mislead the jury concerning . . . the prosecution's burden of proof.'" (*Reliford*, *supra*, 29 Cal.4th at p. 1012.) Our Supreme Court disagreed.

The *Reliford* court reasoned, "the instruction nowhere tells the jury it may rest a conviction solely on evidence of prior offenses. Indeed, the instruction's *next sentence* says quite the opposite: 'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense

35

. . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.'  The jury, of course, was instructed to consider the instructions 'as a whole' (CALJIC No. 1.01) . . . .  [Citations.]  Viewed in this way, the instructions could not have been interpreted to authorize a guilty verdict based solely on proof of uncharged conduct.  [Citations.]" (*Reliford*, *supra*, 29 Cal.4th at p. 1013.)  "Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense in 1991 involving S.B.  The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.'  (CALJIC Nos. 2.61, 2.90; see CALJIC No. 10.65.) . . .  In addition, the jury was told that circumstantial evidence could support a finding of guilt of the charged offenses only if the proved circumstances could not be reconciled with any other rational conclusion (CALJIC No. 2.02)—which is merely another way of restating the reasonable-doubt standard.  (See *People v. Carpenter* (1997) 15 Cal.4th 312, 383.)  The jury thus would have understood that a conviction that relied on inferences to be drawn from defendant's prior offense would have to be proved beyond a reasonable doubt." (*Reliford*, *supra*, 29 Cal.4th at p. 1016.)

The *Reliford* court also "reject[ed] the . . . assertion that the instruction, even if correct, is too 'complicated' for jurors to apply." (*Reliford*, *supra*, 29 Cal.4th at p. 1016.)

"This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial. (E.g., CALJIC Nos. 2.50 [evidence of other crimes under Evid. Code, § 1101], 4.43 [necessity defense], 4.60 [entrapment], 4.74 [statute of limitations], 6.24 [admissibility of coconspirator's statements], 7.73 [failure to file tax returns in prior years], 12.06 [lawful possession of controlled substance].) As we do in each of those circumstances, we will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Id.* at p. 1016.)

The instruction given in the present case differs in only a few respects from the instruction in *Reliford*, the primary distinction being that here the jury was told that it could consider whether defendant committed any other domestic violence crimes, *charged* or uncharged—*Reliford* involved only uncharged crimes. We see no reason to conclude that the addition of charged offenses makes the instruction any more difficult to understand or apply. The procedure for determining whether an inference of propensity may be drawn remains the same in either case. As in *Reliford*, defendant's jury was nowhere told that it could rest its conviction on other crimes evidence, or that it could apply the preponderance of the evidence standard for anything other than determining whether defendant committed

37

another offense involving domestic violence for the purpose of drawing a discretionary inference that defendant had a propensity to commit such offenses. Every jury instruction the trial court gave that mentioned a burden of proof to establish defendant's guilt advised the jury that a conviction could only be based on proof beyond a reasonable doubt. (See CALJIC No. 2.90[12] [definition of proof beyond a reasonable doubt]; CALJIC No. 2.01 [circumstantial evidence]; CALJIC No. 4.21.1 [effect of voluntary intoxication]; CALJIC No. 9.58 [reasonable belief of consent to kidnapping]; CALJIC No. 9.35.01 [domestic violence with a prior conviction]; CALJIC No. 17.01 [unanimity requirement].) No jury instruction referenced conviction on anything other than proof beyond a reasonable doubt. Read as a whole, the charge to the jury was not susceptible to an interpretation that defendant could be convicted on less than proof beyond a reasonable doubt.

Our resolution of this issue is not dependent on which standard of proof is applied to charged offenses for propensity purposes. As *Reliford* emphasized, it is not uncommon for a jury to be instructed on multiple standards of proof in the same case, even when the different standards must be applied to the same evidence for the purpose of making different determinations. In the event that we have incorrectly identified preponderance of the evidence as the

---

[12] The trial court also instructed the jury on the definition of proof beyond a reasonable doubt, in the language of CALJIC No. 2.90, at the time of jury selection.

38

standard for propensity evidence, the inclusion of that standard of proof in the instruction would not undermine our conclusion that the burden of proof for conviction is clear.

### Trial Error Subject to Harmless Error Analysis

Assuming the trial court erred in instructing that the burden of proof for charged crimes used as propensity evidence was a preponderance of the evidence, such error is trial error, subject to harmless error analysis. We reject defendant's contention that the error is structural, which requires reversal per se. Given the strength of the evidence, any assumed error is non-prejudicial.

"In the nearly 50 years since *Chapman* was decided, the high court repeatedly has emphasized that most errors implicating a federal constitutional right, including most instructional errors, are amenable to harmless error analysis and that only a 'very limited class of cases' are subject to per se reversal. [Citations.]" (*People v. Aranda* (2012) 55 Cal.4th 342, 363 (*Aranda*).) As explained by the United States Supreme Court, "while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [(*United States v. Hasting* [(1983)] 461 U.S. [499,] 509.)] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal

trials is to ensure that those trials lead to fair and correct judgments.  Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.  As we have repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'  [(*Delaware v. Van Arsdall* [(1986)] 475 U.S. [673,] 681; *United States v. Hasting*[, *supra*,] at [pp.] 508–509.)]" (*Rose v. Clark* (1986) 478 U.S. 570, 578–579 (*Rose*).)

Following the Court of Appeal in *Cruz*, defendant and our dissenting colleague rely on the following statement in *Aranda, supra*, 55 Cal.4th at page 365:  "An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates *all* the jury's findings' and its effect on the verdict is 'necessarily unquantifiable and indeterminate.'  [Citations.]"  The two cases cited by *Aranda* for this proposition are *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279–282 (*Sullivan*), and *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61 (*Hedgpeth*).  A careful examination of the holding in *Aranda*, and the cases cited, indicates that the *Cruz* court's cursory citation to *Aranda* misapplied the one sentence on which it relied.

The issue in *Aranda* was whether the trial court's failure to provide a standard jury instruction on reasonable doubt constituted structural error requiring reversal.  As to one charge, *Aranda* held the instructional deficiency "did not

40

constitute federal constitutional error" because of other instructions referencing the requirement of proof beyond a reasonable doubt, and as to "state law, we conclude that the state law error was harmless." (*Aranda, supra,* 55 Cal.4th at p. 350.) As to a second charge, the other jury instructions failed to specify that guilt beyond a reasonable doubt was required, and "this omission constituted error under both state law and the federal Constitution" but "the error, like most instructional errors of federal constitutional dimension, is amenable to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), and is not reversible per se." (*Ibid.*) The court held the error was harmless beyond a reasonable doubt. (*Ibid.*)

The *Aranda* court therefore applied harmless error analysis to a case which involved an error potentially far more egregious than any instructional error here, considering that defendant's jury was given the approved standard instruction on reasonable doubt during voir dire and prior to deliberations, and six other instructions referenced the correct burden of proof. Under the reasoning of *Aranda,* any purported error was amenable to harmless error review, and as discussed below, error could not possibly have been prejudicial.

Our conclusion that *Cruz* read too much into *Aranda* is bolstered by an examination of the two cases *Aranda* cited on this point—*Sullivan* and *Hedgpeth*. *Sullivan* stands for the unremarkable proposition that when the jury is provided an instruction that understates the burden of proof, the

41

error is prejudicial per se.  (*Sullivan, supra,* 508 U.S. at pp. 279–282.)  There is no *Sullivan* error here; defendant's jury did not receive a deficient instruction on reasonable doubt. Defendant does not dispute that the trial court correctly instructed the jury with the approved definition of proof beyond a reasonable doubt under CALJIC No. 2.90 both prior to jury selection and at the conclusion of the case, or that the court made repeated references to the correct burden of proof throughout the charge to the jury.  (See *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [rejecting defendant's argument that instructions lowered the burden of proof, in part because jury was "repeatedly instructed" on proper burden of proof].)

*Hedgpeth*, the other case cited by the *Aranda* court, provides no support for *Cruz's* finding of structural error.  In a per curiam decision reversing the Ninth Circuit Court of Appeals, the *Hedgpeth* court held that where a jury is instructed on alternate theories of guilt, one of which is invalid, the error is not structural requiring reversal. (*Hedgpeth, supra,* 555 U.S. at p. 58.)

The analysis in *Rose, supra,* 478 U.S. 570, a case cited with approval in *Aranda,* is instructive.  The issue in *Rose* was "whether the harmless-error standard of *Chapman v. California* 386 U.S. 18, applies to jury instructions that violate the principles of *Sandstrom v. Montana* [(1979)] 442 U.S. 510 [(*Sandstrom*)], and *Francis v. Franklin* [(1985)] 471 U.S. 307."  (*Id.* at p. 572, fn. omitted.)  The *Sandstrom* court held that an instruction in a homicide prosecution that "'the

42

law presumes that a person intends the ordinary consequences of his voluntary acts,' violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." (*Sandstrom*, *supra*, at p. 512.) The *Rose* court held *Sandstrom* error is trial error amenable to harmless error analysis under *Chapman*. (*Rose*, *supra*, at p. 582.)

As *Rose* explained, "the prosecution must prove 'every fact necessary to constitute the crime with which [the defendant] is charged' beyond a reasonable doubt." (*Rose*, *supra*, 478 U.S. at p. 580.) "When the verdict of guilty reached in a case in which *Sandstrom* error was committed is correct beyond a reasonable doubt, reversal of the conviction does nothing to promote the interest that the rule serves." (*Ibid*.) Significantly, the *Rose* court observed that "[n]o one doubts that the trial court properly could have instructed the jury that it could *infer* malice from respondent's conduct. [(See *Francis v. Franklin, supra,* 471 U.S. at [pp.] 314–315; *Ulster County Court v. Allen* [(1979)] 442 U.S. 140, 157–163.)]" (*Id*. at p. 581.) The court ultimately held "that *Chapman'*s harmless-error standard applies in cases such as this one." (*Id*. at p. 582, fn. omitted.)

*Rose* compels the conclusion that any error in former CALJIC No. 2.50.02 is subject to harmless error analysis. The alleged error in the instant case is less egregious than that in *Sandstrom* and *Rose*. The jury was not instructed to presume the existence of an element of a charged offense. Defendant's jury was instructed that it was permitted to

43

draw an inference from defendant's conduct—a proposition that the *Rose* court emphasized "no one doubts." The court then expressly admonished that the inference alone was insufficient to prove guilt and that a guilty verdict required review of all the evidence.

We address the issue of prejudice as to individual counts, but before doing so, we have two observations. The first is that the jury did not view former CALJIC No. 2.50.02 as directing a verdict. The jury found defendant not guilty on one count and was unable to reach verdicts on three others. (See *Quintanilla*, *supra*, 132 Cal.App.4th at p. 583.) Second, the parties' arguments to the jury completely ignored former CALJIC No. 2.50.02 and lacked even a single reference to the principle of disposition to commit domestic violence. These two considerations, along with the strength of the evidence as reviewed below, point to an absence of prejudice.

Defendant was convicted in count 2 of first degree burglary with a person present. The burglary was premised on defendant tearing off the window screen to Amanda's apartment and entering with the intent to commit theft or domestic violence. The only theft issue in the case involved the alleged taking of Amanda's cell phone in a robbery, but the jury acquitted defendant of the robbery charge. As a result, the burglary conviction was based on entry to commit domestic violence. The evidence relating to the burglary is essentially uncontested. Amanda testified that she refused to allow defendant to reenter the apartment. She told the

44

911 operator defendant had broken the screen and beat her up. Officer Pucciarelli and Amanda identified photos of the damaged window screen and the window. In the recorded jail phone calls defendant not only failed to deny committing the charged offenses, he assured Amanda that his conduct was the result of drug use—something he would "change." Photographs dramatically illustrated the substantial beating inflicted by defendant. Additional evidence of defendant's intent at the time of entry is found in the prior act of domestic violence defendant committed against Amanda in 2013, including corroboration from Officer Moya, who saw her split lip in 2013. On this record, the assumed trial error is harmless beyond a reasonable doubt as to the burglary in count 2.

In count 3, defendant was convicted of infliction of injury on a spouse, cohabitant, girlfriend, or child's parent after a prior conviction (§ 273.5, subd. (f)(1)). There is no dispute defendant suffered the prior conviction, which was proven by the record of conviction and Amanda's testimony. The evidence that defendant inflicted the requisite injury on Amanda, his girlfriend and the mother of his child, was overwhelming. In combination, Amanda's testimony, the photographs which graphically depict the results of the beatings, the 911 call, Officer Pucciarelli's testimony, and the admissions made by defendant in the jail calls, establish that any assumed error in giving former CALJIC No. 2.50.02 was harmless beyond a reasonable doubt.

Defendant was convicted in count 4 of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)). The recorded jail calls are replete with defendant's threatening, pleading, and cajoling statements in which he tried desperately to convince Amanda not to attend court or testify. Defendant did not suffer prejudice from former CALJIC No. 2.50.02 in connection with count 4.

Finally, in count 7 defendant was convicted of violation of a domestic violence restraining order (§ 273.6, subd. (a)). The existence of the restraining order is not disputed. The overwhelming testimony outlined above demonstrates defendant violated the restraining order by being in contact with Amanda and inflicting injuries upon her. Nothing in former CALJIC No. 2.50.02 affects the jury's verdict in count 7. No prejudice exists.

### *Admission of Prior Domestic Violence and Phone Sex Evidence*

Defendant argues the trial court abused its discretion under Evidence Code section 352 in overruling his objection to prior acts of domestic violence between himself and Amanda, and in refusing to redact portions of his recorded calls from jail relating to phone sex.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the

46

jury." (Evid. Code, § 352.) We review a trial court's ruling to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 663 (*Fuiava*); *People v. Hamilton* (2009) 45 Cal.4th 863, 929–930.) A court abuses its discretion with a ruling that falls beyond the bounds of reason, or where the ruling is arbitrary, capricious, or patently absurd. (*Fuiava, supra*, at p. 663; *People v. Carrington* (2009) 47 Cal.4th 145, 195; *People v. Osband* (1996) 13 Cal.4th 622, 666.)

We see no abuse of discretion in the trial court's rulings. The nature of the relationship between defendant and Amanda was relevant to the charges in the case. The allegations of violation of the restraining order and dissuading a witness were closely related to defendant's prior acts of domestic violence. Trial of the domestic violence charge involved consideration of defendant's drug usage, which was connected to his prior violent acts, and which defendant relied upon in arguing that he lacked the necessary specific intent on several of the charges. Amanda's credibility was attacked by the defense, and corroboration of her testimony with defendant's prior violent conduct tended to bolster her credibility. The violent relationship between defendant and Amanda, typical of many domestic violence cases, was relevant to the jury's understanding of Amanda's attitude toward the action and her feelings for defendant. Defendant's prior violence also assisted the jury in understanding the context of the statements made in the recorded jail calls.

47

The trial court could reasonably conclude that the evidence of the prior acts of violence by defendant—including the 2013 incident in which Amanda suffered a split lip—was not so prejudicial as to be substantially outweighed by its probative value. The prior conduct was benign in comparison to what was depicted in the photographs of Amanda's injuries in the current case.

Defendant's brief, both in the statement of facts and the argument, fails to set forth the actual content of what he considers inadmissible "phone sex" in one of the recorded jail calls. This alone is a sufficient basis to reject the contention. In any event, defendant's brief concedes the phone sex "had 'very little effect on the issues.'" And although defendant concludes that the evidence "could have only created undue prejudice" against him, he fails to explain how this trivial portion of the evidence affected the outcome of the trial. We conclude there was no abuse of discretion, nor has defendant carried his burden of establishing prejudice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

**Cumulative Error**

Defendant argues that the cumulative effect of the errors relating to the instructions and introduction of evidence requires reversal. "We have rejected his claim of errors or, if error, of individual prejudice, and therefore he could not have suffered cumulative prejudice." (*People v. Tully* (2012) 54 Cal.4th 952, 1020.)

**Unanimity Instruction on the Witness Intimidation Count**

Defendant argues the dissuading a witness charge in count 4 was based on more than one act—his conduct on the date of the charged offenses, and his statements in the recorded jail phone calls. The trial court did not initially give the unanimity instruction (CALJIC No. 17.01) on the charge, although it was given as to other counts. Defendant contends the failure to give CALJIC No. 17.01 was reversible error.

Defendant is correct that the trial court did not initially instruct the jury on the requirement of unanimity with CALJIC No. 17.01 as to count 4, although the instruction was given as to counts 3 and 7.[13] During deliberations, the jury sent a written question to the trial court, asking if count 4 addressed the "prison phone calls" or

---

[13] The court instructed the jury with CALJIC No. 17.01 as follows: "The defendant is accused of having committed the crime of 273.5 in Count[s] 3 & 7. The prosecution has introduced evidence for the purpose of showing that there is more than one act or omission upon which a conviction on Count[s] 3 & 7 may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that he [] committed any one or more of the acts or omissions. However, in order to return a verdict of guilty to Count[s] 3 & 7, all jurors must agree that he [] committed the same act or omission or acts or omissions. It is not necessary that the particular act or omission agreed upon be stated in your verdict."

also the incident on June 20.  The court answered the jury's question with the following response:  "both but you all must agree which (or both) to find defendant guilty."  A minute order reflects that counsel were notified telephonically of the question and they "approve[d] the response."

We reject the claim that the court's failure to repeat CALJIC No. 17.01 in its entirety as to count 4 was reversible error.  First, the issue is forfeited, as the record reflects there was no objection to the court's response, and in fact, counsel approved the court's answer.  (See *People v. Dykes* (2009) 46 Cal.4th 731, 798 [defense counsel approved court's response to jury question]; *People v. Hughes* (2002) 27 Cal.4th 287, 402 [counsel's agreement with the court's response forfeits the issue on appeal].)  Second, the trial court's response to a jury question is reviewed for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746.)  Here, the jury had already received the unanimity instruction as to other counts, and nothing required the court to reread it in its entirety as to count 4.  The court's answer was correct—the jury was required to unanimously agree that defendant was guilty of dissuading a witness either during the charged acts on June 20, during the jail phone calls, or both.  There was no error.

## DISPOSITION

The judgment is affirmed.


KRIEGLER, Acting P.J.


I concur:


LANDIN, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The People v. Danny Garcia
B270574


BAKER, J., Dissenting



Justice Corrigan warned there would be cases like this. In a case of recent vintage, *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), a majority of our Supreme Court held a trial court properly instructed jurors they could consider evidence a defendant committed one or more charged sex crimes as evidence the defendant was predisposed to commit additional charged sex crimes that the prosecution was tasked with proving in the very same criminal trial. (*Id.* at pp. 1164-1165.) Justice Corrigan disagreed, explaining the court's holding "sows the seeds for confusion and unintended consequences." (*Id.* at p. 1169 (conc. & dis. opn. of Corrigan, J.).) Justice Corrigan specifically cautioned that confusion was inevitable if jurors were told they should use the preponderance of the evidence standard to decide whether a defendant committed one or more charged crimes, so as to infer he or she had a propensity to commit other similar charged crimes, but simultaneously told to somehow evaluate whether the defendant was guilty of all the charged crimes by using the constitutionally required beyond a reasonable doubt

standard of proof.  (*Id.* at p. 1181 (conc. & dis. opn. of Corrigan, J.) ["If the same preponderance standard is applied to charged offenses, . . . there is a serious risk of confusion.  Requiring the jury to apply two standards of proof to evidence of the *same crime* would inevitably lead to confusion and could potentially erode the presumption of innocence"].)

The jurors in this case were told precisely what Justice Corrigan foresaw as inevitably confusing.  And that is not all.  The trial court gave a propensity instruction at the prosecution's behest even though the charges and evidence in this case were nowhere near as amenable to a propensity inference as the charges and evidence in *Villatoro*.  The ultimate consequence was a hopelessly circular jury instruction, along with an erosion of the presumption of innocence and the beyond a reasonable doubt standard of proof.

The majority nevertheless affirms the judgment of conviction.  To arrive at that result, the majority expressly disagrees with a recent Court of Appeal decision that— correctly, in my view—holds a propensity instruction of the type given in this case asks far too much of lay jurors and, for practical purposes, lowers the standard of proof to determine guilt in a criminal trial.  (*People v. Cruz* (2016) 2 Cal.App.5th 1178, 1186 (*Cruz*).)  The majority also does not account for another Court of Appeal decision that helps to highlight the problems with the trial court's propensity instruction when considering the evidence in this case—

particularly, the dissimilar nature of the various charges and the jumbled chronology of the victim's testimony. (*People v. Nicolas* (2017) 8 Cal.App.5th 1165 (*Nicolas*).) And furthermore, the majority mistakenly invokes a 30-year-old United States Supreme Court case to cast aside our Supreme Court's direction just five years ago that "[a]n instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error" that is not subject to review for harmlessness. (*People v. Aranda* (2012) 55 Cal.4th 342, 365 (*Aranda*).) For my part, I believe reversal is required, and I write separately to further explain these three areas of disagreement.

I

Evidence of a person's character, i.e., evidence that a person is predisposed to act in a certain way, is generally inadmissible to prove the person acted in conformity with that character trait on a given occasion. (Evid. Code, § 1101, subd. (a); *Villatoro, supra*, 54 Cal.4th at p. 1159.) Evidence Code section 1109, however, is one of the few exceptions the Legislature has made to the general ban on character evidence. The statute provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a)(1).) In other words, "evidence

3

of a prior act of domestic violence is admissible to prove the defendant had a propensity to commit domestic violence when the defendant is charged with an offense involving domestic violence. The trial court has discretion to exclude the evidence if its probative value is outweighed by a danger of undue prejudice or confusing the jury, or would result in an undue consumption of time." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114.)

Prior to 2012, California criminal cases that confronted questions concerning the admission of propensity evidence most often involved evidence of other *uncharged* acts by a defendant, meaning acts that did not serve as the basis for the criminal charges in the prosecution at issue. (See, e.g., *People v. Reliford* (2003) 29 Cal.4th 1007, 1013-1014 (*Reliford*); *People v. Anderson* (2012) 207 Cal.App.4th 1440, 1484-1485 (*Anderson*); *People v. Reyes* (2008) 160 Cal.App.4th 246, 250-253 (*Reyes*); see also *Villatoro, supra,* 54 Cal.4th at p. 1160.) Many of these cases, like the *Reliford* and *Anderson* cases, were decided under Evidence Code section 1108, which permits introduction of propensity evidence in sex offense prosecutions in the same way Evidence Code section 1109 does in domestic violence prosecutions.

The rule these cases settled on is that the prosecution need only prove the defendant committed other uncharged acts by a preponderance of the evidence to permit the jury to consider those uncharged acts when deciding whether the defendant had been proven guilty of the charged offenses

4

beyond a reasonable doubt.  (See, e.g., *Reliford, supra,* 29 Cal.4th at p. 1016 [rejecting argument that the preponderance standard for other *uncharged* acts lowered the prosecution's burden of proof as to the charged crimes because "jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations"]; *Anderson, supra,* 207 Cal.App.4th at p. 1484 [noting the United States Supreme Court has adopted the preponderance standard for proof of *uncharged* bad acts]; *Reyes, supra,* 160 Cal.App.4th at pp. 250, 253 [rejecting argument that instruction on use of *uncharged* acts of domestic violence impermissibly lowered the prosecution's burden to prove the charged offenses].)

In 2012, however, our Supreme Court decided *Villatoro, supra,* 54 Cal.4th 1152.  The question presented in that case was whether Evidence Code section 1108 permits juries to consider not only *uncharged* sexual offenses as evidence of guilt, but whether juries may also "consider the defendant's *charged* sexual offenses as evidence of his propensity to commit the other charged sexual offenses." (*Id.* at p. 1156.)  Specifically, the defendant was charged with raping five women on separate occasions between 2005 and 2008, and the question was whether the trial court appropriately instructed the jury that it could "use evidence of [the] defendant's guilt of [any] one of the charged sexual

5

offenses as evidence of his propensity to commit the other charged sexual offenses." (*Id.* at pp. 1156, 1158.)

The *Villatoro* court held Evidence Code section 1108 does authorize juries to "draw an inference of propensity from other charged offenses" and the trial judge properly instructed the jury it could do just that. (*Villatoro, supra*, 54 Cal.4th at pp. 1164-1166, 1168; *Cruz, supra*, 2 Cal.App.5th at p. 1185 ["[O]ur Supreme Court held that it . . . allows evidence of sexual offenses *charged in the current prosecution* to be used to show a propensity to commit *other* charged offenses in the same case"].) But key to the Court's holding in *Villatoro* was the specific wording of the jury instruction given by the trial judge in that case.[14] The

---

[14] The instruction provided: "'The People presented evidence that the defendant committed the crime of rape as alleged in counts 2, 4, 7, 9, 12 and 15 and the crime of sodomy as alleged in count 14. These crimes are defined for you in the instructions for these crimes. [¶] If you decide that the defendant committed one of these charged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit the other charged crimes of rape or sodomy, and based on that decision also conclude that the defendant was likely to and did commit the other offenses of rape and sodomy charged. If you conclude that the defendant committed a charged offense, that conclusion is only one factor to consider along with all the other evidence. It is not

6

instruction informed the jury "all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity," such that there was "no risk the jury would apply an impermissibly low standard of proof." (*Villatoro, supra,* at pp. 1167-1168.)

In response to the *Villatoro* decision, the CALJIC committee revised its pattern instruction numbers 2.50.01 and 2.50.02, which concern the admission of propensity evidence under sections 1108 and 1109, respectively. Before *Villatoro,* both instructions made reference only to the potential to use uncharged acts as propensity evidence; shortly after *Villatoro,* language was included in each of the instructions in an attempt (unsuccessful, in my view) to marry the standard for consideration of uncharged other acts and *Villatoro*'s holding permitting consideration of other charged crimes. (CALJIC Nos. 2.50.01, 2.50.02 (Spring 2013 ed.) [citing *Villatoro* in the comment to the pattern instructions].)

The trial court in this case instructed the jury with CALJIC No. 2.50.02 as it existed at the time (it has recently been revised again in light of *Cruz,* as noted by the majority

_____

sufficient by itself to prove the defendant is guilty of another charged offense. The People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.'" (*Villatoro, supra,* 54 Cal.4th at p. 1167.)

7

and *post*).  This was the instruction given to the jury, with emphasis on the portions that are relevant to the issues presented in this appeal:

> "*In determining whether defendant has been proved guilty of the any* [sic] *crime of domestic violence of which he she* [sic] *is charged, you should consider all relevant evidence, including whether defendant committed any other domestic violence crimes, whether charged or uncharged, about which evidence has been received.  The crimes charged in Counts 1–8, may be considered by you in that regard.*

> "'Domestic violence' means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating or engagement relationship.

> [¶] . . . [¶]

> "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

*"If you find by a preponderance of the evidence that the defendant committed any such offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit another other* [sic] *offenses involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he she* [sic] *was likely to commit and did commit the crime or crimes of which he she* [sic] *is accused.*

*"However, even though you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he . . . committed the offenses you are determining.* If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime that you are determining."

Thus, as worded, the first paragraph instructed the jury that all of the crimes charged against defendant were "domestic violence crimes." That is because the instruction defined "other domestic violence crimes, whether charged or

9

uncharged" to include each and every count of the information against defendant. Of course, this meant the instruction would permit the jury to use its findings on any individual count (e.g., dissuading a witness) as reason to convict defendant on any of the other counts (e.g., disobeying a domestic relations court order). The fourth paragraph of the instruction, as quoted above, explained the conditions under which the jury could do this. That is, paragraph four told the jury it could rely on its findings on one or more of the counts to influence its verdict on other counts (i.e., it could conclude defendant "was likely to commit and did commit" the charged crimes) if it found one or more of the counts proven by a preponderance of the evidence and used that finding to infer defendant had a disposition to commit the other offenses. At the same time, the final paragraph of the instruction cautioned the jury that if it found by a preponderance of the evidence that defendant committed "a prior crime or crimes involving domestic violence," that would not be sufficient by itself to prove beyond a reasonable doubt that defendant "committed the offenses you are determining."

The *Cruz* decision holds that giving this sort of instruction is error. In *Cruz, supra*, 2 Cal.App.5th 1178, the defendant was charged with three counts of committing a lewd act against a child under age 14. (*Id.* at pp. 1180-1181.) The trial judge instructed the jury with the CALJIC-modeled sex crimes propensity instruction that is in all material respects identical to the domestic violence propensity

10

instruction in this case. (*Id.* at pp. 1183-1184 [reciting the instruction given].)

Unlike the jury instruction given by the trial judge in *Villatoro* (but like the instruction here), the instruction in *Cruz* stated "the preponderance [of the evidence] standard applied to the determination of whether Cruz committed charged and uncharged offenses for the purpose of deciding whether he had a propensity to commit sexual offenses." (*Cruz, supra,* 2 Cal.App.5th at p. 1185.) As *Cruz* explains, this was problematic: "In effect, the instruction . . . told the jury it should first consider whether the offenses charged in counts 1, 2, and 3 had been established by a preponderance of the evidence, while holding its ultimate decision on the same offenses in suspension. Then the jury was required to decide whether the preponderance finding showed a propensity, and whether this propensity, in combination with the other evidence, proved those offenses a second time, this time beyond a reasonable doubt. [¶] We conclude the court was incorrect to instruct the jury in this way. *Villatoro* did not expressly hold that currently charged offenses must be proved beyond a reasonable doubt before they can be used to show a propensity under Evidence Code section 1108, but it strongly implied that rule. . . . [¶] A robot or a computer program could be imagined capable of finding charged offenses true by a preponderance of the evidence, and then finding that this meant the defendant had a propensity to commit such offenses, while still saving for later a decision about whether, in light of all the evidence, the same offenses

11

have been proven beyond a reasonable doubt. A very fastidious lawyer or judge might even be able to do it. But it is not reasonable to expect it of lay jurors. We believe that, for practical purposes, the instruction lowered the standard of proof for the determination of guilt." (*Id.* at pp. 1185-1186.)

The *Cruz* analysis, which largely parallels Justice Corrigan's earlier observation in *Villatoro*, should control here.[15] As in *Cruz*, the instruction the trial court gave told

_____

[15] Perhaps the most revealing sentence in the majority's opinion is this: "Echoing Justice Corrigan's dissent in *Villatoro*, our dissenting colleague essentially argues *Cruz* was correctly decided and *Villatoro* was not." (Maj. Opn. at p. 25.) That misses the point entirely. Justice Corrigan's opinion is significant here not because of the points on which it disagreed with the holding of *Villatoro*, but because it understood *Villatoro* "sow[ed] the seeds for confusion" in future cases if a jury received a propensity instruction concerning *charged* offenses that did not incorporate the beyond a reasonable doubt language that saved the instruction in *Villatoro* and instead incorporated preponderance of the evidence language used for other *uncharged* acts. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1169, 1181 (conc. & dis. opn. of Corrigan, J.).) The majority opinion does not recognize the distinction and, indeed, is founded on the notion that a charged offense is no different from an uncharged offense for purposes of crafting a

12

the jury it should first consider whether all the charged offenses had been established by a preponderance of the evidence, then decide whether that preponderance finding demonstrated a propensity, and then consider whether this propensity, in combination with the other evidence, proved the same offenses again beyond a reasonable doubt.  That "presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence" and "the ultimate effect [was] to lower the prosecution's burden of proving guilt beyond a reasonable doubt."  (*Cruz, supra*, 2 Cal.App.5th at p. 1187.)

## II

Even putting aside the problem with the propensity instruction given as illuminated by *Cruz*, the instruction suffers from an additional weakness—one that appears when focusing on the evidence and charges in this case as contrasted with the evidence and charges at issue in other cases where a propensity instruction was given.

---

propensity instruction.  As the *Cruz* court understood, however, the distinction makes all the difference.  Use of charged offenses to show propensity is what can introduce (absent the features of the instruction in *Villatoro*) confusing, competing standards of proof that effectively lower the prosecution's burden to prove guilt.

13

In *Villatoro*, our Supreme Court approved the use of a propensity instruction in a case where there were five alleged rapes, of five different victims, at five different times. (*Villatoro, supra*, 54 Cal.4th at pp. 1156-1158.) In *Cruz*, the trial judge gave a propensity instruction (albeit a defective one, for reasons already recounted) in a case where there were three child sex offenses involving separate conduct, against separate victims, on separate dates. (*Cruz, supra*, 2 Cal.App.5th at pp. 1181-1182.) Here, however, the offenses charged against defendant were not predicated on acts that are fully distinct, both factually and temporally.

The eight crimes charged against defendant were considered crimes of domestic violence, and were included in the trial court's propensity instruction, based on what was essentially a continuous course of conduct by defendant as described by victim Amanda during her trial testimony. The problem, however, is that Amanda's testimony (even if believed in its entirety) concerned alleged criminal acts that occurred over the course of mere hours within a single day, and her recounting of the alleged criminal acts was chronologically jumbled to the point that the order in which defendant committed the acts alleged was unclear. The Attorney General forthrightly acknowledges the problem, conceding that "Amanda was unable to remember the exact order of the incidents [that served as the basis for the charged crimes] because they occurred on the same day and [defendant] went back and forth to her apartment." Indeed, the manner in which Amanda testified at trial compels the

14

Attorney General to disclaim that his attempt to even recite the facts of this case is "based on what appears to be the most accurate order based upon Amanda's disjointed testimony."

The logical principle that permits admission of propensity evidence—encapsulated in the text of Evidence Code section 1109 itself—is that a jury may draw an inference a defendant is prone to commit a charged crime from *other* incidents of a sufficiently similar nature. (Evid. Code, § 1109, subd. (a)(1) ["[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible . . ."].) Considering Amanda's testimony in this case, there really was no "other" domestic violence.[16] Unlike *Villatoro* where there were five discrete rapes such that a jury could conclude, for instance, that the defendant had a propensity

---

[16] In fact, because the jury had no reliable basis to determine in which order the alleged criminal acts by defendant occurred, the jury could not possibly have followed the propensity instruction's admonition that a finding "by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence . . . is not sufficient by itself to prove beyond a reasonable doubt that he . . . committed the offenses you are determining." The jury had no way to determine which of the crimes were "prior."

to commit a charged rape against victim N.G. in June 2006 because he raped another victim R.I. in May 2005 (*Villatoro*, *supra*, 54 Cal.4th at pp. 1156-1157), the jury in this case had no reliable basis to distinguish among the alleged criminal acts and instead was left with an inseparable tangle. Giving a propensity instruction under these circumstances permitted the jury to draw what, in effect, were self-reinforcing, circular inferences—allowing the jury to infer, for instance, that defendant was prone to disobeying a court order and beating Amanda based on the same evidence the jury would have to use to conclude he disobeyed a court order and beat her.

That is not the only problem on the specific facts of this case. Again unlike *Villatoro*, and even *Cruz*, the eight charges against defendant are not all similar in a way that the sex offenses in those cases very much were. (*Villatoro*, *supra*, 54 Cal.4th at p. 1158 [five counts of rape]; *Cruz*, *supra*, 2 Cal.App.5th at p. 1180 [three counts of committing a lewd act against a child].) Under the statutory definition of "domestic violence" (Evid. Code, § 1109, subd. (d)(3)), or at least the trial court's broad application of that definition, the propensity instruction in this case swept so broadly as to include every charge against defendant within its ambit—from burglary to injuring a cohabitant, robbery to disobeying a domestic relations court order.

While there is good reason to believe that a defendant who commits sex crimes or core domestic violence offenses may be disposed to commit *similar* crimes, that good reason

is absent when some of the charges are as disparate as they are here.  Only on the most aggressive application of propensity principles would a factfinder be justified in concluding that defendant's commission of a burglary, for instance, makes him particularly prone to dissuading a witness.  That sort of aggressive application, however, is exactly what the trial court's propensity instruction permitted despite being inconsistent with the public policy and fundamental fairness reasons why courts have long recognized the danger of permitting juries to consider propensity evidence.  (See *People v. Falsetta* (1999) 21 Cal.4th 903, 913 [observing that the rule excluding criminal propensity evidence is nearly three centuries old].)  The instruction at issue permitted the jury to use the prosecution's decision to charge defendant with multiple crimes to infer defendant had a propensity to commit crimes generally, and to use that sort of inference for all seasons when deciding whether to find him guilty.

The *Nicolas* case, while not factually similar in all respects, helps to highlight these fact-specific problems with the trial court's propensity instruction.  In *Nicolas*, the trial court gave the jury a propensity instruction that permitted using uncharged acts (sending text messages before a car collision resulting in death) to infer propensity if proven by a preponderance of the evidence, even though the text messages "'were a continuous back-and-forth conversation leading up to [the] time of the collision . . . [and] were an indivisible part of the offense itself.'"  (*Nicolas, supra,* 8

17

Cal.App.5th at p. 1178.)   Analogously, the course of conduct defendant engaged in, as described by Amanda, was such that the evidence at trial constituted an indistinguishable whole supporting all the charges, many of which bore little elemental similarity.  The consequence was an unwieldy and erroneous jury instruction that, as in *Nicolas*, undercut the burden of proof and the presumption of innocence on each of the charged offenses.  (*Id.* at pp. 1181-1182.)

## III

Hedging its bets, the majority opinion holds that even if it was error to give the propensity instruction at issue, the error was harmless.  I believe I must take our Supreme Court at its word, and that means I must conclude the instructional error here is not amenable to harmlessness review and is instead reversible per se.

Our Supreme Court in *Aranda* articulated the pertinent rule as follows:  "An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error" and reversible per se.[17] (*Aranda, supra*, 55 Cal.4th at p. 365.)  The courts in *Cruz* and *Nicolas* had no difficulty applying this rule to conclude

---

[17] Our Supreme Court's use of the word "effectively" indicates the rule applies beyond those circumstances in which a trial court gives a defective reasonable doubt instruction (see, e.g., *Sullivan v. Louisiana* (1993) 508 U.S. 275).

18

the errors there—like the error here, in my view—required reversal without any effort to attempt an analysis of prejudice. (*Nicolas*, *supra*, 8 Cal.App.5th at pp. 1181-1182 ["Here, the trial court gave what the Attorney General concedes was an erroneous and unnecessary jury instruction. . . . [¶] [U]nder the rule announced by our Supreme Court in *Aranda* . . . and appropriately applied by the Court of Appeal in *Cruz* . . . , we find that the trial court's erroneous jury instruction concerning 'uncharged offenses' constitutes structural error and is reversible per se"]; *Cruz, supra*, 2 Cal.App.5th at p. 1187.)

There is no basis to disregard the unqualified language of *Aranda* by resort to a case that had long been on the books when *Aranda* was decided: *Rose v. Clark* (1986) 478 U.S. 570 (*Rose*). As an initial matter, I doubt that *Rose* is "instructive." *Rose* holds that a jury instruction that misallocates the burden of proof as to a single element of a charged crime can be amenable to harmlessness review (*id.* at pp. 579-580), but that is of course different from an instructional error that effectively lowers the burden of proof entirely. (*Aranda, supra*, 55 Cal.4th at p. 365 [citing *Hedgpeth v. Pulido* (2008) 555 U.S. 57 for the proposition that harmless-error analysis applies to instructional errors *so long as* the error does not categorically vitiate all the jury's findings].) In that circumstance, which is the case here, reliably assessing whether the jury would have properly found defendant guilty on the proof presented is prohibitively difficult, and a harmlessness inquiry runs the

19

risk of degenerating into a usurpation of the role of a jury in a criminal trial.[18]  (See *Kotteakos v. United States* (1946) 328 U.S. 750, 763 ["[I]t is not the appellate court's function to determine guilt or innocence. . . . Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out"].)  But my doubts aside, there is no direct conflict between *Rose* and *Aranda*, and settled stare decisis principles require this court to follow *Aranda* and leave to our Supreme Court the task of announcing it overlooked the implications of *Rose* when writing *Aranda*, if that is in fact what occurred.  (See *People v. Superior Court* (*Williams*) (1992) 8 Cal.App.4th 688, 702-703 ["'[W]e are . . . bound by [decisions of] the California Supreme Court . . .

---

[18] For example, it is immaterial that "the jurors were told seven times that the burden of proof was on the prosecution to prove guilt beyond a reasonable doubt . . . ." (Maj. Opn. at p. 2.)  While a court may properly conclude that a jury is likely to have followed a more specific instruction over a more general instruction, a court can only guess what burden of proof a jury applied simply by counting the number of references in a jury instruction packet and concluding the jury probably was swayed by those that are more numerous.  When an error seriously threatens the beyond a reasonable doubt standard that is fundamental to the fairness of criminal trials, reviewing courts should require parties and trial courts to get it exactly right, not mostly right.

unless the United States Supreme Court *has decided the question* differently'"], emphasis added.)

## IV

Fortunately, the impact of today's decision is limited. As the majority recognizes, both the CALCRIM and CALJIC committees have revised their pattern jury instructions concerning the use of charged offenses to prove propensity. I submit that even those who are inclined to agree with the views espoused by the majority would see these clarifying revisions as a step in the right direction. The recent revisions also largely if not entirely eliminate the issue of statewide importance this case would otherwise present. Nevertheless, the impact on this defendant remains, and I respectfully dissent from the affirmance of the judgment. As the revised pattern instructions help illustrate, the confusion generated by the earlier version of the propensity instruction at issue in this case was "entirely avoidable" (*Villatoro*, *supra*, 54 Cal.4th at p. 1181 (conc. & dis. opn. of Corrigan, J.)), and I see no reason to hold this instruction up as a model to which prosecutors and trial courts should aspire.

BAKER, J.

21